# EXHIBIT A

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERSAWVERE, INC., | |
| Plaintiff, | |
| v. | C.A. No. 1:21-cv-00400 |
| MILWAUKEE ELECTRIC TOOL, CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## EXPERT REPORT OF GREGORY J. GONSALVES, PH.D., J.D.

## TABLE OF CONTENTS

ATTACHMENTS ....................................................................................... iii

I.      INTRODUCTION ........................................................................... 1

II.     BACKGROUND and QUALIFICATIONS ...................................... 2

        A.      Compensation ................................................................... 6

        B.      Level Of Skill Of A Person Of Ordinary Skill In The Art ... 6

III.    OVERVIEW OF THE PATENT SYSTEM, THE PARTS OF A
        PATENT APPLICATION, PATENT APPLICATION FILING
        REQUIREMENTS, AND THE PATENT EXAMINATION
        PROCESS ........................................................................................ 7

        A.      Patent System Overview ..................................................... 7

        B.      Parts of a Patent Application ............................................. 8

        C.      The Patent Application Filing Requirements ..................... 12

        D.      Related Patents and Claiming the Benefit of the Filing Date of
                an Earlier Filed Application. ............................................. 13

        E.      The U.S. Patent and Trademark Office. ........................... 15

        F.      The Patent Examination Process ....................................... 16

        ii.     Applicant's Response and Reconsideration by the Examiner. ........... 19

        iii.    Allowance ......................................................................... 20

        G.      The Duty of Candor and Good Faith and Duty of Disclosure ........... 21

IV.     The '681 PATENT .......................................................................... 24

        A.      The '681 Patent and The Asserted Claims ....................... 24

        B.      The Prosecution History Of The '681 Patent. ................... 28

V.      INEQUITABLE CONDUCT AND the duty of Candor .................. 30

A. General..............................................................................................30

B.      The Duty To Disclose Information Material To Patentability............35

C.      Relevant Case Law....................................................................37

D.      Mr. McIntosh Did Not Satisfy His Duty To Disclose
        Information Material To Patentability ................................................40

VI.    CONCLUSION.................................................................................49

VII.   TRIAL Exhibits ............................................................................50

VIII.  SUPPLEMENTATION ..................................................................50

## **ATTACHMENTS**

ATTACHMENT A: U.S. Patent No. 8,607,681

ATTACHMENT B: Resume of Dr. Gregory J. Gonsalves

ATTACHMENT C: List of Materials Reviewed

ATTACHMENT D: prosecution file history of U.S. Patent No. 8,607,681

ATTACHMENT E: Transcript of Deposition of Mr. Scott McIntosh

ATTACHMENT F: Milwaukee Electric Tool bandsaw catalogue advertisement

ATTACHMENT G: Milwaukee Electric Tool bandsaw catalogue advertisement

ATTACHMENT H:  Claim Construction Opinion, D.I. 84

ATTACHMENT I: U.S. Patent No. 6,442,848 to Dean

## OPENING EXPERT REPORT OF GREGORY GONSALVES, Ph.D.

**I.    INTRODUCTION**

1.      I have been retained as an independent expert by Morgan Lewis & Bockius LLP on behalf of Milwaukee Electric Tool Corporation ("Defendant" or "Milwaukee Electric") in its lawsuit against Plaintiff Persawvere, Inc. (hereinafter "Persawvere") to provide expert analysis and testimony, including with respect to United States patent practice and procedures generally, and specifically as they relate to the prosecution of patent application 11/857,772 ("the '772 patent application) at the U.S. Patent and Trademark Office ("USPTO") that resulted in the issuance of U.S. Patent 8,607,681 ("the '681 Patent").

2.      My opinions are based on information listed in Attachment C and any additional materials cited herein. I may rely on any of the materials, experiences, and knowledge identified in Attachment C, in addition to any evidence and material specifically cited herein as supportive examples in this expert report, as additional support for my opinions.

3.      I may also provide testimony (i) in rebuttal to Plaintiff's positions, including opinions of any of Plaintiff's experts and any materials they discuss or rely upon, (ii) based on any Orders from the Court, (iii) based on documents or other discovery that Plaintiff has not yet produced or that were produced too late to be considered before my expert report was due, (iv) based on witness testimony which has not been given or was given too late to be considered before my expert report was due, and (v) any amendments to pleadings in this case by Plaintiff. I reserve the right to supplement or amend my opinions as further documentation and information is received.

4.      I reserve the right to supplement or amend this expert report if additional facts and information that affect my opinions become available.

1

## II.     BACKGROUND AND QUALIFICATIONS

5.      I am now and have been working as a patent attorney at Wolf, Greenfield & Sacks, P.C. since June 2022.  During this time, I have participated in all aspects of patent prosecution on dozens of patent applications, have performed essentiality analyses for standards relating to video encoding and decoding, and have counseled clients on open-source software, infringement allegations, etc.

6.      Prior to joining Wolf Greenfield & Sacks, P.C., I worked as a patent attorney at the Law Office of Dr. Gregory J. Gonsalves, which I founded, from July 2013 to June 2022. During that time, I represented clients as lead counsel in more than 260 *inter partes* reviews (IPRs) and covered business method (CBM) reviews before the Patent Trial and Appeal Board (PTAB), in more than two dozen appeals of IPRs and CBMs at the Court of Appeals of the Federal Circuit, and an appeal to the U.S. Supreme Court. I also prosecuted *ex parte* patent applications and reexaminations.

7.      During the more than twenty years that I have been practicing before the USPTO, I have never been found to have committed inequitable conduct.

8.      From June 2010 to June 2013, I worked for the USPTO, first as a patent attorney and later as a Judge at the PTAB and its predecessor (the Board of Patent Appeals and Interferences). As a Judge, I reviewed the decisions of Examiners on *ex parte* applications and re-examinations and made judgments as to whether to affirm or reverse the Examiners' decisions.

9.      From 1997 to 2010, I worked as a patent attorney in private practice for various firms including Pennie & Edmonds, Jones Day, Jenner & Block, and the Law Office of Dr. Gregory J. Gonsalves. During this time, I worked on all aspects of patent litigation at various district courts, including the District Court of the Eastern District of Virginia. I also prosecuted *ex parte* applications and re-examinations at the USPTO.

10.    I have also performed pro bono work though the public defender's office representing criminal defendants who did not have the money to pay for an attorney.

11.    From January 1983 to 1997, I worked as an Electrical Engineer and Computer Scientist at various companies including IBM, Loral, and Lockheed Martin. As an engineer, I led teams in the design and development of software for various applications, including the automated design of integrated circuits, timing analysis, logic synthesis, verification, hierarchical design tools for integrated circuit design, air traffic control, and satellite scheduling, etc. I held a Top-Secret security clearance during the time that I worked on projects for the United States government.

12.    I have written well over one hundred thousand lines of code in various programming languages including IBM 360/370 assembly language, PL1, PL/AS, Fortran, Cobol, C, C++, Java, and Basic.

13.    I designed and developed software to automate the design of integrated circuits. I designed and developed a timing analysis system to ensure that the signals propagated from a circuit input or an output of a latch to a circuit output or an input of a latch. The system supported different technologies, including complementary metal oxide semiconductor (CMOS) technologies and bipolar technologies. The system input a library of circuits available for a particular technology, a logic diagram, etc. and computed the time required for signals to propagate along paths through the logic diagram by referring to the data provided in the library for the circuits.

14.    I designed and developed software to create detailed hierarchical logic diagrams and technology-dependent logic diagrams from more abstract descriptions prepared using hardware description languages such as Very High-Speed Integrated Circuit Hardware Description Language (VHDL).

3

15.     I designed and developed a probabilistic hill climbing algorithm to optimize a logic diagram. The algorithm achieved better results because it had the ability to transition from locally optimal solutions to better solutions. I presented my research at the International Conference on Computer Design in 1996 (ICCD '86) and wrote a paper on the research that was published in the conference proceedings. Greg Gonsalves, "Logic synthesis using simulated annealing," Proceedings of the 1986 IEEE International Conference on Computer Design: VLSI in computers, Port Chester, New York, October 1986.

16.     I continued my research and designed another algorithm that selected circuits from a technology library to optimize the synthesis of a technology-dependent logic diagram. This work was published as Gonsalves, G. J., "Technology Mapping Using Simulated Annealing," IBM Technical Disclosure Bulletin, Aug. 1990, vol. 33, No. 3A, p. 308.

17.     I designed and developed combinatorial optimization algorithms to schedule the image capture of different locations in response to input provided by the user. I designed and developed interface software between IBM's Multiple Virtual System (MVS) and Advanced Interactive eXecutive operating systems for an application that located downed aircraft.

18.     I have continued to use my engineering experience and education in my work as a patent attorney. I have worked on patents involving storing, indexing, and retrieving image data from databases, code modulation, sound editing, wireless mesh networks, routing algorithms, central control of remote actuators and sensors via wide area and wireless networks, semi-conductor circuit design for blue-light light emitting diodes (LEDs), computer security, modular lighting structures, video encoding and decoding, etc.

19.     I graduated with honors with a J.D. from Georgetown University Law Center in 1997. I hold three engineering degrees all with highest honors: a Ph.D. in Computer Engineering

and a M.S. in Electrical Engineering from Syracuse University, and a B.S. in Electrical Engineering from Northeastern University.

20.     Based on my experience as a patent attorney in private practice and as an Administrative Patent Judge at the USPTO, I have significant familiarity with all aspects related to the examination of patent applications.  This includes knowledge about the Manual of Patent Examining Procedure ("MPEP")[1], which the Patent Office publishes as a binding guide to examiners, as well as the rules and statutes relating to examination of applications set forth in Title 37 of the Code of Federal Regulations ("C.F.R.") and Title 35 of the United States Code ("U.S.C."), respectively.

21.     I have significant knowledge of the duty of disclosure and duty to make truthful representations concerning what patent practitioners must do to comply with the Patent Office requirements of candor, good-faith, truthful representations, and disclosure in dealing with Examiners.  This experience comes from more than two decades of experience working at or with the United States Patent and Trademark Office.

22.     Also, I have served as a testifying expert witness on the duty of disclosure and duty to make truthful representations concerning what patent practitioners must do to comply with the Patent Office requirements of candor, good-faith, truthful representations, and disclosure in dealing with Examiners on numerous occasions as evidenced by Attachment B for this Report.

23.     I have considerable experience in reviewing patent prosecution histories, including specifications and interpreting claim language, as a result of my service as an Administrative Patent Judge at the Patent Trial and Appeal Board and  as an attorney in private practice.

---

[1] http://www.uspto.gov/web/offices/pac/mpep/ (Ninth Edition, Revision 08.2017).

24.     Additional details about my employment history and education are further included in my resume attached hereto as Attachment B. I note that in the past six years, I offered deposition testimony in three cases: *C&M Oilfield Rentals, LLC Apollo Lighting Sols. and Cleantek Industries, Inc.*, Case No. 6:21-CV-00544 (W.D. Tex.), *Applied Capital, Inc. v. The ADT Corporation and ADT LLC*, Case No. 1:16-cv-815-JB-SCY (D.N.M. 2020), and *Video Share, Inc. v. Google, LLC and Youtube, LLC*, Case No. 1:16-cv-815-JB-SCY (W.D. Tex.).

### A. Compensation

25.     For my analysis and testimony in this case, I am being compensated at $755/hour. I am also being reimbursed for reasonable and customary expenses associated therewith. No part of my compensation is dependent upon the results of this district court case or the substance of my testimony.

### B. Level Of Skill Of A Person Of Ordinary Skill In The Art

26.     I understand that the parties have agreed to the definition of a person having ordinary skill in the art ("POSITA") for the subject matter claimed in the '681 patent as a person with (i) at least an Associate's degree in engineering technology or a related field, or (ii) a comparable amount of post-high school education in engineering technology or a related field and at least 2 years of practical experience in analyzing, developing or manufacturing power tools. In the alternative, a person of ordinary skill in the art can be someone with (iii) at least six years of practical experience with analyzing, developing or manufacturing power tools.

27.     As indicated by the experience and education described above and my resume, I meet or exceed the level of a POSITA.

### III. OVERVIEW OF THE PATENT SYSTEM, THE PARTS OF A PATENT APPLICATION, PATENT APPLICATION FILING REQUIREMENTS, AND THE PATENT EXAMINATION PROCESS

#### A. Patent System Overview

28.     According to the Commerce Clause of the U.S. Constitution, Article I, Section 8, Congress has the authority to promote the progress of science and the useful arts by providing inventors exclusive rights to their inventions for a limited time. Pursuant to its authority, Congress established a patent system and the United States Patent & Trademark Office (PTO), an agency in the U.S. Department of Commerce, to examine patent applications and grant patents.

29.      The patent statutes are in Title 35 of the United States Code ("U.S.C."). The PTO promulgates regulations in Title 37 of the Code of Federal Regulations ("CFR"), which implement the patent statutes. The Manual of Patent Examining Procedure ("MPEP")[2], published by the PTO, sets forth practices and procedures governing the examination of patent applications before the PTO for use by patent examiners, applicants, and their attorneys, agents, and representatives.

30.     The PTO grants a patent for an invention as property right to the inventor. A patent grants "the right to exclude others from making, using, offering for sale, or selling" the invention in the United States or "importing" the invention into the United States, for a limited period of time.[3]  Granting patents is intended to encourage the investment of time and resources into the development of new and useful discoveries and the disclosure of those discoveries to the public.

31.     Before issuing a patent, the PTO determines whether the statutory requirements for patentability are met. To be patentable, an invention must be new, useful, nonobvious, and definite. A patent must contain an adequate written description of the claimed invention, and the description

---

[2] Throughout this report, all references to the MPEP will refer to the Manual of Patent Examining Procedure Ninth Edition, Revision 10.2019, Last Revised June 2020.
[3] *See* 35 U.S.C. §154 (a) (1).

of the invention must enable one of ordinary skill in the art to make and use the invention. If the PTO determines that the patentability requirements are met, the PTO will issue a patent based on the application filed by one or more applicants. The PTO should not issue a patent unless the patentability requirements are satisfied. Once a patent issues it is presumed valid.[4] The presumption of validity, however, may be overcome by a showing of clear and convincing evidence of invalidity.

32.     The PTO sometimes issues patents that should not have been issued.  For example, a patent may be mistakenly issued because the PTO examiner may not have fully comprehended the evidence. To address this situation, Congress has establishing procedures by which patents may be invalidated by a judge or a jury in a court proceeding, after they are issued by the PTO or by the Patent Trial and Appeal Board at the PTO in a post grant proceeding. A patent may be held unenforceable by a court for various reasons, including if it is proven by clear and convincing evidence that the applicant or his or her representative committed inequitable conduct during the prosecution of the patent before the PTO.

### B.  Parts of a Patent Application

33.     I expect to provide testimony explaining various parts of a patent application, including the information provided on the front page of an issued patent, the specification, the claims, and the prosecution history.

### i.    Specification and Claims

34.     I expect to testify about the purpose and function of the patent specification.  The Specification is the technical disclosure that describes an inventor's alleged innovation, including what the invention is, what it does, and how to make it.  A proper patent specification provides

---

[4] 35 U.S.C. § 282.

support for the claims.  See 37 C.F.R. § 1.71(a); MPEP § 608.01.  In addition, the specification

may include examples, which are embodiments or variations of the invention.  It includes, among

other things, a title, continuity data, background, brief summary, and detailed description.  Based

on my experience at the USPTO as an Administrative Patent Judge at the Patent Trial and Appeal

Board, I am familiar with how examiners review a patent application, and in particular, how

examiners review the specification of each application for compliance with its requirements and

to ensure that the specification supports the claims.

35.     I expect to testify about the claims and their purpose.  See MPEP §§ 608.01(i),

2111, 2173, and 2181.  A patent concludes with one or more claims particularly pointing out and

distinctly claiming the subject matter that the applicant regards as his invention.  See 35 U.S.C. §

112, second paragraph.  The claims are numbered at the end of the patent.  Each claim defines a

separate property right.  The scope or meaning of a claim (other than one reciting means- or step-

plus-function limitations under 35 U.S.C. § 112, paragraph 6) is defined by the words of the claims,

subject to any definitions or disclaimers in the patent or during the prosecution of the patent

application that led to the patent. Claims are supposed to provide specific notice to the public about

the boundaries of the property right.  From my service as an Administrative Patent Judge at the

Patent Trial and Appeal Board, I understand that examiners consider the language of the claims

when examining the patentability of an invention, often rejecting an applicant's arguments during

prosecution that relate to features that are disclosed in the specification but not recited in the

claims.

36.     By statute, an applicant for a patent must include as part of the application a

specification that contains a written description of the invention and the manner and process of

making and using the invention "in such full, clear, concise, and exact terms as to enable any

person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112, first paragraph; MPEP § 608.01.  Examiners at the USPTO are instructed to require applicants to revise an application if they were to determine that it "obviously fails to disclose an invention with the clarity required." MPEP § 608.01.

37.     A patent specification must satisfy three requirements: to include a written description of the invention, to enable a person of ordinary skill in the art to make and use the invention, and to set forth the best mode of carrying out the invention. MPEP § 2161.

38.     A primary policy reason underlying the requirements of the specification, is that they ensure "that the public receives something in return for the exclusionary rights that are granted to the inventor by a patent." MPEP § 2162.  "The grant of a patent helps to foster and enhance the development and disclosure of new ideas and the advancement of scientific knowledge.  Upon the grant of a patent in the U.S., information contained in the patent becomes a part of the information available to the public for further research and development, subject only to the patentee's right to exclude others during the life of the patent." *Id*.  Thus, in exchange for the exclusionary rights of a patent, an applicant is required to "put the public in possession of the invention and to enable those skilled in the art to make and use the invention" without concealing "the best way of practicing the invention." *Id*.

39.     Regarding the requirement of providing a written description of the invention, the specification must "clearly convey the information that an applicant has invented the subject matter which is claimed." MPEP § 2163 (quoting *In re Barker*, 559 F.2d 588, 592 n.4 (CCPA 1977)). Examiners are instructed that "[t]o satisfy the written description requirement, a patent

specification must describe the claimed invention in sufficient detail that one skilled in the art can reasonably conclude that the inventor had possession of the claimed invention." *Id*.

40.     The specification must also enable a person of ordinary skill in the art to make and use the invention as set forth in the claims. MPEP § 2164.  The focus of the inquiry is on the invention defined in the claims.  "All questions of enablement are evaluated against the claimed subject matter.  The focus of the examination inquiry is whether everything within the scope of the claim is enabled.  Accordingly, the first analytical step requires that the examiner determine exactly what subject matter is encompassed by the claims." MPEP § 2164.08.

41.     After determining the claim scope, Examiners determine whether the specification teaches "those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Id*. (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)).  "The fact that experimentation may be complex does not necessarily make it undue, if the art typically engages in such experimentation." MPEP § 2164.01.

42.     The question of whether the experimentation required to make and use the invention is "undue" is a factual determination based upon the consideration of many factors.  Examiners are instructed that the factors include, but are not limited to: (A) The breadth of the claims; (B) The nature of the invention; (C) The state of the prior art; (D) The level of one of ordinary skill; (E) The level of predictability in the art; (F) The amount of direction provided by the inventor; (G) The existence of working examples; and (H) The quantity of experimentation needed to make or use the invention based on the content of the disclosure." Id. (citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)).

43.     Examiners are instructed that the form of the disclosure in the specification is not critical in the enablement analysis.  For example, "[a]n enabling disclosure may be set forth by

specific example or broad terminology; the exact form of disclosure is not dispositive." MPEP § 2164.08.  Thus, the question of enablement "does not turn on whether an example is disclosed" in the specification. MPEP § 2164.02.  In addition, the test of enablement does not take into consideration the commercial viability of disclosed embodiments, unless the claims actually recite that requirement. MPEP § 2164 (The specification need not enable a "perfected, commercially viable embodiment absent a claim limitation to that effect.") (quoting *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003)).  Examiners typically read the claims of the application first. Then, they read the specification in light of what is claimed without reading unclaimed limitations into the claims.

### ii.   Prosecution History or File History

44.     I expect to provide testimony regarding the various parts of a prosecution history or file history, which is the record of the examination of a patent application.  It includes, among other things, the Patent Application as filed, the Examiner Search Notes, Examiner Interview Summaries, Declarations and Affidavits, Office Actions, and Applicants' Amendments and Replies.  These documents provide a written record of the prosecution of a patent application at the U.S. Patent Office including communications between the Applicants and the Examiners.  I also intend to provide testimony regarding the file histories of the '68 patent and related patents and applications.

### C.  The Patent Application Filing Requirements

45.     To obtain a patent, an applicant must first submit a patent application to the PTO. The application discloses and claims the subject matter for which patent protection is sought. The application is required to include a specification, a claim or claims, and drawings when necessary, an inventor's oath or declaration from each inventor, and the required fees.

46.     The specification must fully describe the subject matter that the applicant regards as the invention. A set of claims follows the specification. The claims must particularly point out and distinctly describe the subject matter that the applicant regards as the invention.[5] The claims define the metes and bounds of the protection sought by the applicant and inform the public of the scope of protection of a patent.

47.     Claims may be written in independent or dependent form. An independent claim does not refer to or incorporate any other claim. A dependent claim, in contrast, refers to another claim and further limits the referenced claim.[6]

48.     The oath or declaration by the inventors must certify that they believe that they are the first inventors of the claimed subject matter in the patent application, and that they have reviewed and understand the contents of the application including the claims. The inventors also make various other certifications such as the duty of disclosure which requires them to disclose information known to be material to patentability. The PTO assumes that the statements made in the oath or declaration are truthful and that the inventors have reviewed the contents of the application including the claims, understand the requirements of the duty of disclosure, and have complied with that duty and all other PTO requirements.[7] Statements made by inventors in an oath or declaration are sworn statements made under the penalty of perjury.[8]

**D.  Related Patents and Claiming the Benefit of the Filing Date of an Earlier Filed Application.**

49.     A U.S. patent application may be entitled to claim the benefit of the filing date of an earlier filed application that has at least one common inventor. The earlier filed application must

---

[5] *See* 37 CFR 1.75(a).
[6] *See* 37 CFR 1.75(c).
[7] *See* 37 CFR 1.56 & 1.63.
[8] *See* MPEP 602.

disclose the invention claimed in the later filed application in accordance with 35 U.S.C. § 112, first paragraph. Also, the later filed application must be co-pending with the earlier filed application and must reference the earlier filed application.

50.     For example, a nonprovisional application may claim the benefit of an earlier filed provisional application under 35 U.S.C. § 119(e) if the later filed nonprovisional application is filed within twelve months of the filing date of the provisional application. A provisional application is not examined but is accessible to examiners, who may review its contents.

51.     Applications may also claim the benefit of an earlier filed U.S. nonprovisional ("parent application") under 35 U.S.C. § 120. These types of applications are called "continuing" applications. A "parent" application is an inventor's earlier filed nonprovisional application. Patent applications having the same parent application are described as "related." One type of continuing application is called a "continuation" application. A continuation application is a later filed application for the same invention as the parent application and has the same disclosure as the parent application. The claims of a continuation application, however, may have a different scope.[9] "New matter" may not be added to a continuation application.  Rather, the common specification shared by the parent and continuation applications must fully disclose the scope of the claims in the continuation application.[10]

52.     In particular, a later-filed (child) application is entitled to the benefit of the filing date of an earlier filed (parent) application only if the parent application discloses the invention(s) claimed in the child application's claim(s) in the manner required by 35 U.S.C. §112 (a) or pre-AIA first paragraph.[11] That is, the parent application must adequately support and enable all of the

---

[9] *See* MPEP 201.07.
[10] *See* 35 U.S.C § 132.
[11] The '681 patent was examined under pre-AIA provisions.

subject matter claimed in the child application. A continuation application may not include anything that would constitute new matter if inserted in the parent application. Similarly, no new matter may be added to an application (e.g., by an amendment) after filing.

53.     An examiner may not need to determine if a child application is entitled to the filing date of the parent application, unless there is prior art with an intervening filing date. In that situation, the examiner will analyze the disclosure of the parent application to determine if the invention claimed in the child application is supported in the manner required by 35 U.S.C. § 112, first paragraph. Thus, while an applicant may claim the benefit of the filing date (priority) to an earlier filed application(s) by meeting the formal requirement, the claims of the child application are not entitled to benefit of the filing date of the earlier filed application(s) unless the subject matter of the claim of the child application is fully described in the earlier filed application(s) as required by 35 U.S.C. § 112, first paragraph.

### E.  The U.S. Patent and Trademark Office.

54.     I expect to testify about the role and function of the USPTO, and the rules and procedures that govern patent application examination. Congress established the Patent Office (as part of the Department of Commerce), to administer the patent system contemplated by the Constitution. The patent laws, as set forth in Title 35 of the United States Code, specify the subject matter for which a patent may be obtained and the conditions for patentability.

55.     The rules of practice for practitioners to follow in preparing and prosecuting applications before the Patent Office are in Section 1 of Title 37 of the C.F.R. The Patent Office periodically publishes and updates a guide called the Manual of Patent Examining Procedure (MPEP), which is binding upon examiners, and informative to patent attorneys and patent agents regarding examination of patent applications.

56.     I have reviewed the prosecution history for the patent-in-suit.  Based on my review, it is my opinion that the formal USPTO procedures for examination of patent application were not followed.

### F.  The Patent Examination Process

57.     Upon receipt of a patent application at the PTO, administrative staff perform a preliminary review to ensure that the application meets the formal requirements established by Congress and the PTO. If the application fails to meet the formal requirements, the applicant will be notified of the deficiencies and given a certain amount of time to complete the formal requirements for the application.[12]

58.      After this initial review of a patent application, the application is assigned to an examiner in a Group Art Unit that is responsible for examining the patentability of patent applications in a particular technological area.

### i.     Office Actions

59.     An examiner must examine a patent application to determine whether the claims of the application satisfy all of the requirements for patentability set forth in the patent statutes and rules.[13] The examiner must also conduct a search for "prior art" related to the claimed invention.[14] Prior art includes prior patents (both U.S. patents and foreign patents), prior published patent applications, and prior non-patent publications (e.g., magazines, trade journals, and published academic articles or theses), known as "non-patent literature." In addition, prior art may include prior public uses, sales, and offers for sale of the invention such as physical products or systems.[15]

---

[12] *See* MPEP 601.01 (a) II A.
[13] *See* 37 CFR 1.104.
[14] *See* MPEP 704.01
[15] *See* 35 U.S.C. § 102.

Prior art may include the inventor's own publicly known prior publications, journal articles, patents, and products.

60.     Patent examiners record their search in the prosecution file history to provide a complete and accurate record of what has been searched and what prior art has been considered.[16]

61.     After examining the patent application and analyzing the prior art, the examiner writes an Office Action providing patentability conclusions. An Office Action informs the applicant whether the examiner has concluded that none of the claims are patentable or that one or more of the claims are patentable, and explains the reasons for the examiner's conclusions.

62.     For an invention to be patentable, the claims must set forth subject matter that is eligible for patenting, novel and nonobvious in view of the prior art, and sufficiently described to enable one of ordinary skill in the art to make and use the invention.[17]

63.     Claims may be rejected, for example, because the examiner concludes that they are not directed to patent-eligible subject matter under 35 U.S.C. § 101. There are two criteria for subject matter eligibility. First, the claimed invention must be directed to one of the four statutory categories—processes, machines, manufacturers, and compositions of matter. Second, the claimed invention must not be directed to a judicial exception such as an abstract idea, law of nature, or natural phenomena. The Supreme Court in *Mayo* laid out a framework for determining whether acclaims are directed to a judicial exception itself, or a patent-eligible application of a judicial exception. *See Alice Corp. v. CLS Bank International*, 573 U.S. 208, 212-214 (2014) (*citing Mayo Collaborative Servs. v. Prometheus Labs.*, Inc. 566 U.S. 66 (2012)). The PTO uses the Alice/Mayo two-part test to evaluate the subject matter eligibility of the claims.[18]

---

[16] *See* MPEP 719.05.
[17] *See* MPEP 706.
[18] *See* MPEP 2106.

64.     Claims may also be rejected if the examiner determines they are not novel over the prior art (anticipation under 35 U.S.C. § 102) or would have been obvious over the prior art (obviousness under 35 U.S.C. § 103). When making an obviousness rejection under 35 U.S.C. § 103 the examiner has the initial burden of factually supporting a prima facie conclusion of obviousness, which then shifts the burden to the applicant to respond with evidence of non-obviousness.[19]

65.     Claims may also be rejected on the grounds of double patenting. There are two types of double patenting rejections: (1) a same invention type or "statutory" rejection based on 35 U.S.C. 101 which states in the singular that an inventor may obtain "a patent"; and (2) "nonstatutory" double patenting rejection based on a judicially created doctrine grounded in public policy that is primarily intended to prevent extending the patent term by prohibiting claims in a later filed patent that are not patentably distinct from claims in an earlier filed patent.[20]

66.     The doctrine of nonstatutory double patenting also prevents the possibility of multiple suits against an accused infringer by different assignees of patents claiming patentably indistinct variations of the same invention.[21] The submission of a terminal disclaimer in compliance with 37 CFR 1.321(b) to overcome a double patenting rejection ensures that a patent owner with multiple patents claiming obvious variations of one invention either retains or sells all those patents as a group. Nonstatutory double patenting includes rejections based on anticipation, a one-way determination of "obviousness," or a two-way determination of "obviousness." It is important to note that the "obviousness" analysis for nonstatutory double patenting is similar to,

---

[19] *See* MPEP 2142.
[20] *See* MPEP 804.
[21] *See* MPEP 804.02 VI

but not necessarily the same as, that undertaken under 35 U.S.C. 103.[22] In addition, nonstatutory double patenting includes rejections based on the equitable principle against permitting an unjustified timewise extension of patent rights.[23]

67.     An Office Action identifies the references and information relied on by the examiner in reaching his patentability concludes.[24]

### ii.     Applicant's Response and Reconsideration by the Examiner.

68.     Upon receipt of an Office Action containing rejections or objections, an applicant may amend the specification and/or claims. An applicant may also respond to the rejections and objections set forth in an Office Action by explaining why the applicant feels that the Examiner erred. Applicants must respond to each ground of rejection or objection. If an Applicant fails to do so, an examiner may treat the reply as non-responsive and require the applicant to file a complete response.[25]

69.     Amendments to the specification and/or claims are shown by the applicant's response underlining subject matter intended to be added and striking through or enclosing within double brackets subject matter intended to be deleted.[26] Any amendments to the application are limited to the disclosure that was originally provided (i.e., no new matter may be added by amendment).

70.     The examiner then reviews any amendments and/or arguments submitted by the Applicant to determine if the conditions for patentability are met. The examiner can either allow

---

[22] *See* MPEP 804 B.2
[23] *See In re Schneller*, 397 F.2d 350, 158 USPQ 210 (CCPA 1968); see also MPEP 804, subsection II.B.3.
[24] *See* 37 CFR 1.104.
[25] *See* 37 CFR 1.111.
[26] *See* MPEP 714.

the application or issue a second Office Action either maintaining the rejections and/or objections or setting forth new rejections and/or objections. There are typically one or more rounds of these type of exchanges between the examiner and the applicant before prosecution on the merits is closed. If the examiner continues to reject the claims in a second Office Action, particularly on the same or similar grounds, he or she may designate the second Action is made "final." In response to a Final Office Action, the applicant can appeal the decision of the examiner to the PTO Patent Trial and Appeal Board (and ultimately to the federal courts), file a continuing application or a request for continued examination, or abandon the application.

### iii.     Allowance

71.     If, on the examiner's original examination of the application, or after considering the responses and amendments made by the applicant, the examiner finds that the patent application is allowable, the examiner will send a Notice of Allowability to the applicant. A Notice of Allowability accompanied by a Notice of Allowance and Fee(s) Due is sent by the USPTO "whenever an application has been placed in condition for allowance." MPEP § 1302.03. The Notice of Allowance and Fee(s) Due specifies the issue fee that must be paid to avoid abandonment. Id. at § 1303. The USPTO does not issue a patent until the issue fee has been paid and the patent printing process has been completed.

72.     Once a Notice of Allowance has issued, prosecution on the merits of the application is closed. Applicants need only pay an issue fee and publication fee, if applicable, to permit the patent to issue. No further substantive response is required nor permitted by the Applicant as a matter of right.

73.     Further substantive proceedings after issuance of a Notice of Allowance are limited to amendments under 37 C.F.R. § 1.312 and withdrawals from issue under 37 C.F.R. § 1.313. After

the Notice of Allowance has been sent, the application is no longer under the jurisdiction of the primary Examiner. The Examiner can only withdraw or cancel claims or correct minor typographical errors that do not change the scope of the claims. Anything else requires approval by the Supervisory Patent Examiner. See MPEP §§ 714.14 and 714.16.

74.     An examiner may include reasons for allowance in the file history. Although reasons for allowance are not required, they help to create a clear record, which facilitates evaluation of the scope and strength of a patent by the patentee and the public and may help avoid or simplify litigation of a patent.[27]

75.     Once issued, United States patents have a "presumption of validity."[28] To overcome the presumption of validity in a legal proceeding, an accused infringer must prove invalidity under the clear and convincing standard.[29]

### G.     The Duty of Candor and Good Faith and Duty of Disclosure

76.     Patent prosecution is an "*ex parte*" process between applicants or their agents/attorneys and a PTO examiner, meaning that third parties do not receive notice that an application has been filed and generally are not permitted to participate. Applications are confidential until they are published, usually 18 months after the earliest effective filing date. Patent applicants, their representatives, and others substantively involved in the preparation or prosecution of a patent application have a duty of candor and good faith in dealing with the PTO. Additionally, these individuals have a duty to provide the PTO with information that they know is material to patentability of the claims pending in the application. This obligation, which is referred

---

[27] *See* MPEP 1302.14.
[28] *See* 35 U.S.C. § 282.
[29] *See Microsot Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011).

to as the applicant's "duty of disclosure" is important to the successful operation of the patent system. The duty of candor and good faith is set forth in 37 CFR § 1.56:

> (a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

> > (1) Prior art cited in search reports of a foreign patent office in a counterpart application, and
> > (2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

> (b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

> > (1)  It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim:
> > or

> > (2)  It refutes, or is inconsistent with, a position the applicant takes in:

> > > (i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

77.      According to CFR § 1.56(c), the following individuals have the duty of disclosure:

(1)  Each inventor named in the application;

(2) Each attorney or agent who prepares or prosecutes the application; and

(3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

78.      Applicants typically disclose information to the PTO in an Information Disclosure Statement ("IDS"), which lists the prior art or other material information. If an IDS is filed,[30] the examiner will consider the prior art references or other information in the IDS during the examination of the application. The examiner will consider the documents in the same manner that he or she considers other documents found by a prior art search. Initials placed by the examiner on the IDS form for a particular reference indicate that the reference was considered. This means the examiner will review the information to the extent necessary to gauge materiality to the claims to determine if a closer review is required, which may or may not require a review of the entirety of the document.

79.      The front page of every issued patent lists the references that were found and considered by the examiner, as well as references submitted by the applicant in one or more IDSs that the examiner considered. References cited by the examiner are distinguished by an asterisk (*).

80.      Attorneys and agents who represent patent applicants before the PTO must be registered to practice there. In particular, the PTO requires attorneys and agents to pass a

---

[30] 37 CFR §§ 1.97 and 1.98.

23

specialized patent bar examination like state bar examinations. Thus, those who represent applicants before the PTO are required to have specialized knowledge of PTO rules and procedures.

81.     The PTO policies and procedures require applicants and their representatives to disclose all information that is known to be material to patentability to the PTO, including possible prior public knowledge or sales/offers for sale, prior invention by another, inventorship conflicts, and the like.[31] Additionally, information from related litigation that is material to patentability must be disclosed to the PTO.[32] This would include information that a patentably indistinct claim in a related patent was held to be invalid in a federal court proceeding.[33]

## IV.   THE '681 PATENT

### A. The '681 Patent and The Asserted Claims

82.     The '681 Patent is entitled "Hand-held Band Saw."

83.     The sole inventor listed on the '681 Patent is Scott McIntosh.

84.     The assignee listed on the '681 Patent is Persawvere, Inc.

85.     According to the first page of the '681 Patent, application number 11/857,772 was filed on September 19, 2007, as a division application of U.S. Utility Application Ser. No. 10/776,838 filed Feb. 11, 2004 (now U.S. Patent 7,287,454), which claims the benefit of U.S. Provisional Patent Application Ser. No. 60/448,295, filed on Feb. 19, 2003.

86.     The '681 Patent generally relates to "a hand-held band saw [] provided for one-hand operation. The band saw has a frame and a handle extending from a longitudinal edge of the frame at an acute angle and opposite an edge containing a throat for receiving the work piece."

---

[31] *See* MPEP 2001.04.
[32] *See* MPEP 2001.06 (c).
[33] *See* MPEP 2190 II.

Attachment A, '681 Patent at Abstract. "FIG. 3 [reproduced below] is an oblique side of the invention." *Id.* at 3:7.



FIG. 3

87.     "The frame assembly 12 includes a first end 16 interconnected to a second opposite end 18 by a laterally offset longitudinal member (LOLM) 20 which establishes the general framework for the out-off saw 10. Handle assembly 14 is connected to frame assembly 12 at various locations including the LOLM 20 and medial portions of the first end 16 such that the center of gravity of the cut-off saw 10 is disposed centrally below handle assembly 14." *Id.* at 3:49-56.

88.     "Journaled to the underside of the first end 16 of frame assembly 12 is a drive pulley 22 of predetermined diameter coupled via a transmission 24 to an electric motor 26, both

respectively shown extending from the upper surface of first end 16. A driven pulley 28 is journaled to the underside of the second end 18 of the frame assembly 12 by way of a tensioning assembly (not shown) mounted to the frame assembly 12. The tensioning assembly may take on any one of a number of configurations to translate driven pulley 28 relative to drive pulley 22 for retaining a continuous loop blade 30 mounted on pulleys 22 and 28." *Id.* at 3:57-67.

89.   "Extending toward the parallel section of the continuous loop blade 30 opposite that of the LOLM 20, and mounted on the medial portions of end members 16 and 18, are brackets 32 and 34, respectively. Roller bearing assemblies 36 and 38 disposed at the end of each bracket 32, 34 are intended to engage opposing sides of blade 30 and cause the blade 30 to twist a predetermined angle relative to the tangent of the pulleys 22 and 28. Orienting that portion of the blade 30 in the "throat" area 40 between ends 16 and 18 provides the greatest cutting depth for the blade. A stop plate or fence 41 extends from bracket 34 for receiving the work piece and provides stability." *Id.* at 4:1-12.

90.   The Specification of the patent alleges that "one of the advantages provided by the invention is the one-handed balanced operation. This is achieved by locating the handle intermediate the drive and driven pulleys 22, 28, respectively, rather than outboard as in previous designs. Moreover, it is intended to suspend the frame assembly 12 at a point below the handle assembly 14 such that the saw, under the effect of gravity, hangs naturally when gripped by the operator." *Id.* at 4:13-20.

91.   "The handle assembly 14 includes a pistol grip 42 having a trigger assembly 44 for controlling the cutting speed of the motor 26. Integral with the grip 42 is a receptacle intended to slidably receive, or otherwise connect to a rechargeable battery pack 46, providing power to the motor 26 via the trigger. The location and dimension of the battery pack 46 is designed to offset

and substantially balance the weight of the cantilevered components so the saw feels well balanced within the user's grip. Appropriate connections and locks are to be provided to receive and hold the battery pack 46 in place." *Id.* at 4:21-30.

92.     "The cut-off saw 10 shown in the drawing figures illustrates a skirt 48 extending generally downward around the blade 30 and fastened at intervals to the frame assembly 12. In a preferred embodiment, the skirt extends substantially around the saw except around the portion of the blade traversing the throat area 40. Clearly, the absence of the skirt in this area permits the blade 30 to engage the work piece." *Id.* at 4:31-37.

93.     Exemplary independent claim 1 recites:

1. A portable hand-held band saw capable of being fully supported and operated single-handedly for performing a one-handed cutting operation using a closed loop saw blade, comprising:

a substantially planar frame having a first end and a second end for housing a first drive wheel with a first rotational axis at the first end and a second driven wheel with a second rotational axis at the second end, wherein the drive wheel and the driven wheel engage the closed loop saw blade, said substantially planar frame defining a first plane;

a throat within the frame, said throat being able to receive a workpiece, wherein the throat exposes a portion of the closed loop saw blade angled within the throat;

the exposed portion of the angled saw blade defining a second cutting plane which is different from, and at an angle to, the first plane of the substantially planar frame;

a drive assembly mounted to the band saw;

a handle assembly extending upwardly and outwardly at an angle from the plane of the

frame, said handle assembly including at least a part of a hand grip portion located

between the first axis of the drive wheel and the second axis of the driven wheel;

said handle assembly permitting the operator to lift and operate the saw with one hand,

and said handle assembly being located such that the saw is substantially weight

balanced, so that the saw can be utilized in a single-handed operation for cutting the

workpiece while holding the workpiece with another hand of the operator;

wherein the handle assembly defines yet a third plane that is substantially parallel to the

second cutting plane of the saw blade, this third handle plane being positioned outwardly

from the second cutting plane; and

a trigger within the hand grip portion, said trigger capable of being activated by the

operator while operating the saw single-handedly, and wherein the trigger is also located

between the first drive wheel axis and the second wheel axis.

### B.  The Prosecution History Of The '681 Patent.

94.     I have reviewed the prosecution history of the '681 Patent.

95.     On December 17, 2013, the '681 Patent was issued by the PTO.  Mr. Scott McIntosh

is the sole inventor of the '681 Patent.

96.     Prosecution of the application leading to the '681 Patent took over six years.  The

PTO repeatedly rejected the claims, and Applicant submitted numerous rounds of amendments to

the claims.  At one point, Applicant cancelled all pending claims and submitted a new set.

97.     On April 22, 2009, the PTO issued a non-final rejection that rejected some of the

pending claims under 35 U.S.C. § 103 as being unpatentable over Rentsch (U.S. Patent No.

2,876,809) in view of Dean (U.S. Patent No. 6,442,848).  Attachment D at PSAW00000240-241.

In response, Mr. McIntosh submitted a Declaration to the PTO that argued his invention was distinguishable over Dean and Rentsch. Attachment D at PSAW00000227-234.

98.    For example, in his Declaration, Mr. McIntosh addressed the reference to Dean. Attachment D at PSAW00000228-229, ¶ 7.  Mr. McIntosh stated that in his "expert opinion," "performing a cutting operation while holding the saw 110 would be impractical for the vast majority of users because a **center of gravity of the saw 110 is spaced from the handle 114**, and thus a user holding the saw 110 by the handle 114 would have to overcome a moment produced by gravity acting on the center of gravity of the saw." *Id*.  Mr. McIntosh also stated that in his "expert opinion," given the "typical weight of hand-held power cutting tools, a typical user would have a difficult time holding the saw 110 in a stable position to make a cut due to the difficulty of overcoming the moment." *Id*.  He also stated that in his "expert opinion," a "user could not operate the saw 110 with only one hand while holding the saw 110 at the handle 150 because . . . the user would still have to overcome a moment produced by gravity **acting on the center of gravity of the saw 110, which is also spaced from the handle 150**." *Id*.

99.    Following this, the PTO issued a final rejection on December 1, 2009 maintaining that the claims were unpatentable. Attachment D at PSAW00000207-214.  In the Final Rejection, the PTO never stated it disagreed with Mr. McIntosh's arguments regarding whether the prior art references could be operated with one hand or where the alleged center of gravity of the saws in the prior art references, such as Dean, were located.  *Id*. ¶ 9.  Instead, the USPTO stated that the Declaration was not persuasive because the pending claims at that time did not recite the feature of a handle assembly allowing for "one-handed operation." *Id*.

100.   Prosecution continued for years, and on April 23, 2012, Applicant cancelled all pending claims, submitting an entirely new claim set. Attachment D at PSAW00000076-083.  On

December 13, 2012, the PTO issued another non-final rejection, rejecting the pending claims under 35 U.S.C. § 103 as being unpatentable over Schepige (U.S. Patent No. D156,282) in view of Buck (U.S. Patent No. 6,996,909).  Attachment D at PSAW00000041.

101.    In response, Applicant amended the claims to recite, in relevant part, "said handle assembly permitting the operator to lift and operate the saw **with one hand**, and said handle assembly being located such that the saw is **substantially weight balanced, so that the saw can be utilized in a single-handed operation** for cutting the workpiece while holding the workpiece with another hand of the operator."  Attachment D at PSAW00000025.  Applicant also argued that the prior art design patent reference to Schepige describes a bandsaw for two-handed operation that is thus in "direct contradistinction over the presently claimed invention, where it is currently reciting a single handed capability and usage." Attachment D at PSAW00000028-29.  Applicant's arguments relied only on the drawings in Schepige to argue that Schepige was designed for two-handed operation and thus was distinguishable from the claimed one-handed capability.  *Id*.

102.    After Applicant's amendments and arguments, the PTO allowed the claims and issued the '681 Patent.  Attachment D at PSAW00000012-014.

## V.    INEQUITABLE CONDUCT AND THE DUTY OF CANDOR

### A. General

103.    Inequitable conduct is an equitable defense to patent infringement that bars enforcement of a patent. This judicial doctrine evolved from three Supreme Court cases that applied the doctrine of unclean hands to patent cases involving egregious misconduct: *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 (1933), *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), *overruled on other grounds by Standard Oil Co. v. United States*, 429 U.S. 17 (1976), and *Precision Instruments Manufacturing Co. v. Automotive Maintenance*

*Machinery Co.*, 324 U.S. 806 (1945). Each of these unclean hands cases before the Supreme Court dealt with egregious misconduct. They all involved "deliberately planned and carefully executed scheme[s] to defraud" not only the USPTO, but also the courts. *Hazel-Atlas*, 322 U.S. at 245. The unclean hands doctrine remains available to supply a remedy for such egregious misconduct. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292-93 (Fed. Cir. 2011) (en banc).

104.     To establish inequitable conduct, one must show "that material information was intentionally withheld [or misrepresented] for the purpose of misleading or deceiving the patent examiner." *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995). Intent to deceive "cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1134 (Fed. Cir. 2006) (citing *Hebert v. Lisle Corp.*, 49 F.3d 1109, 1116 (Fed. Cir. 1996)).

105.     Intent to deceive, however, may be inferred where material information was not disclosed by an individual having a duty of disclosure who knew of the undisclosed information, knew of its materiality, and made the conscious decision not to disclose it. *Therasense*, 649 F.3d at 1290–91. The specific intent to deceive must be the "the single most reasonable inference able to be drawn from the evidence." *See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008). Intent "may be proven by a showing of acts the natural consequences of which are presumably intended by the actor." *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983). Courts also consider whether there was only one instance or instead multiple instances of misrepresentations or omissions. *See Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333 (Fed. Cir. 2013). Intent to deceive the PTO may be shown through a pattern of

misconduct by those owing a duty of disclosure. *Apotex, Inc. v. UCB, Inc.*, 763 F. 3d 135 (Fed. Cir. 2014).

106.    Prior to *Therasense,* the Federal Circuit's decision in *Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309 (Fed. Cir. 2006), noted that, "several different standards of materiality" have "emerged from the courts," including: (1) "the objective 'but for' standard, where the misrepresentation was so material that the patent should not have issued"; (2) "the subjective 'but for' test, where the misrepresentation actually caused the examiner to approve the patent application when he would not otherwise have done so"; and (3) "the 'but it may have' standard, where the misrepresentation may have influenced the patent examiner in the course of prosecution." *Digital Control*, 437 F.3d at 1315 (citations omitted).

107.    In *Digital Control*, the Federal Circuit also noted that,

> In *American Hoist*, one of the first cases of inequitable conduct addressed by this court, we noted that this Rule 56 standard of materiality was yet a fourth "official standard." 725 F.2d at 1362. Although "strikingly similar to the 'but it may have' guideline," we noted that the PTO standard was "an appropriate starting point for any discussion of materiality, for it appears to be the broadest, thus encompassing the others and because that materiality boundary most closely aligns with how one ought to conduct business with the PTO." *Id*. at 1362-63. Further, we noted that "[t]here is no reason [] to be bound by any single standard," as a finding of inequitable conduct requires a balancing of materiality and intent. *Id*. at 1363. Thus, where "a reasonable examiner would merely have considered particular information to be important but not crucial to his decision" the requisite finding of intent must be high. *Id*. Conversely, where an objective "but for" standard of materiality is shown, "a lesser showing of facts from which intent can be inferred may be sufficient."

*Id*. at 1315–16.

108.    This approach has been described as a sliding scale to find inequitable conduct.

109.    *Therasense* clarified the meaning of "materiality" in the context of inequitable conduct. There, the Federal Circuit acknowledged that it "has looked to the PTO's Rule 56 in the past as a starting point for determining materiality," for example, as it did in *Digital Control*. *Therasense*, 649 F.3d at 1294. The *Therasense* court, however, declined to adopt Rule 56 as the materiality standard for proving inequitable conduct.

110.    Rather, the Federal Circuit held that a "but for" standard governs materiality in the context of inequitable conduct. Under this rule, undisclosed information is material if it is shown by a preponderance of the evidence that the PTO would not have allowed a claim to issue if it had been aware of the undisclosed prior art:

> [T]he materiality required to establish inequitable conduct is but for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.[34] In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction.

*Therasense*, 649 F.3d at 1291.

111.    The Court stated that "if a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO." *Id.* at 1292.

---

[34] This determination is made after considering any patentee's rebuttal argument and evidence.

112.     In other words, the standard for materiality after *Therasense* is that "but for" the nondisclosure of information, the PTO would not have allowed the patent to issue. *Therasense*, 649 F.3d at 1293–96.

113.     Although the "but-for" materiality standard generally must be proved to establish inequitable conduct, there is an exception in cases of affirmative egregious misconduct. *See Therasense*, 649 F.3d at 1292-93. When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is *per se* material or material as a matter of law. *See id.*; *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983); *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1342 (Fed. Cir. 2013); *see also Apotex, Inc. v. UCB, Inc.*, 763 F.3d 1354 (Fed. Cir. 2014). Affirmative egregious acts are not limited to the filing of unmistakably false affidavits and include consideration of varied facts and equitable considerations determined by the courts on a case-by-case basis. *See, e.g.*, *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333 (Fed. Cir. 2013) (misrepresenting opposing party's declarant's level of interest to undermine his credibility before the PTO is tantamount to filing an unmistakably false affidavit).

114.     When false and misleading statements have been made to the PTO, the Federal Circuit has outlined the specific way to cure such errors *before* the patent has issued. *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556 (Fed. Cir. 1983). This roadmap requires that (1) the Applicant "expressly advise the PTO of the misrepresentation's existence, stating specifically wherein it resides," (2) "if the misrepresentation is of one or more facts, the PTO be advised what the actual facts are, the applicant making it clear that further examination in light thereof may be required if any PTO action has been based on the misrepresentation," and (3) "on the basis of the new and factually accurate record, the applicant must establish patentability of the claimed subject

34

matter." *Id.* at 1572. The Federal Circuit stated that, "[i]t does ***not*** suffice that one knowing of misrepresentations in an application or in its prosecution merely supplies the examiner with accurate facts without calling his attention to the untrue or misleading assertions sought to be overcome, leaving him to formulate his own conclusions." *Id.* (emphasis added).

115.    The Federal Circuit confirmed its holding in *Rohm & Haas* remain good law after *Therasense. See Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1343 (Fed. Cir. 2013). In *Intellect Wireless*, the Court held that the Applicant must "expressly negate" false statements and "openly advise" the PTO of the misrepresentations. *Id.* at 1343. "Obfuscating the truth" is not sufficient to cure a falsehood. *Id.* Without a statement by the Applicant "openly admitting" its false statement, there is no full disclosure or correction of the record. *Id.* at 1343-44; *see also Ohio Willow Wood Co. v. Alps S., LLC*, 813 F.3d 1350, 1358-59 (Fed. Cir. 2016) (failure to correct material misrepresentations held to demonstrate deceptive intent).

116.    Related patents may be unenforceable under the doctrine of infectious unenforceability because of the inequitable conduct committed during the prosecution of a related patent when the conduct during the prosecution of the related patent had an immediate and necessary relation to the enforcement of other patents. *Consolidated Aluminum Corp. v. Foseco International Ltd.*, 910 F.2d 804, 810-811 (Fed. Cir. 1990).

### B.   The Duty To Disclose Information Material To Patentability

117.    37 C.F.R. § 1.56 imposes a duty on patent applicants and their prosecution counsel to disclose information material to patentability.

118.    Rule 56 states:

**§ 1.56 Duty to disclose information material to patentability.**
(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has

a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

(1) Prior art cited in search reports of a foreign patent office in a counterpart application, and

(2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

(b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1) Each inventor named in the application;

(2) Each attorney or agent who prepares or prosecutes the application; and

(3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application.

(d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

## C. Relevant Case Law

119.    I have reviewed relevant case law to confirm my understanding of the current state of the law. Relevant exemplary cases include *Cordis Corp. v Boston Scientific Corp*, where an inventor did not disclose a reference (*Hillstead*) to the USPTO. *Cordis Corp v Boston Sci. Corp.*, 658 F.3d 1347, 1351 (Fed. Cir. 2011). In that case, the inventor received, from his attorney handling prosecution of foreign counterparts, a "Search Report from the European Patent Office" identifying *Hillstead* along with five other references. *Id.* at 1351. The attorney handling the foreign counterparts identified only one of the six references—not Hillstead—as "particularly relevant if taken alone." *Id.* The attorney testified that he "carefully" reviewed the primary reference, and "scanned" 5 secondary references, including *Hillstead*. *Id.* at 1352. Neither the attorney nor the inventor took particular notice of the relevance of *Hillstead*, until it was specifically raised by counsel for the defendants in the litigation. *Id.* at 1353. Only then was the reference submitted to the USPTO, along with 70 other references, and *Hillstead* was never emphasized as being of particular interest. *Id.* Given these facts, and "particularly the finding with respect to [the inventor's] reliance on [the attorney's advice], [the Federal Circuit did] not find clear error in the district court's conclusion that the evidence does not unequivocally demonstrate specific intent to deceive." *Id.*

37

120.    Relevant exemplary cases further include *American Calcar Inc. v American Honda Motor Co.*, 768 F.3d 1185 (Fed. Cir. 2014). In *Am. Calcar*, the CAFC affirmed a finding of inequitable conduct based on the intentional omission of undisclosed operational details of a prior art navigation system. *Id.* at 1192. The court found that the inventor's testimony lacked credibility, and that the inventor had not been candid about his possession of photographs of the prior art system. *Id.* at 1191. The district court further found that the inventor possessed material information based on his testimony about his personal knowledge of the prior art system, test drives of the prior art system, and use of figures from the prior art manual in the patent application he drafted. *Id.* The inventor further specifically acknowledged the importance of the information he possessed about the prior art system. *Id.* On this basis, the district court also found that the single reasonable inference based on the facts regarding the inventor's role in developing the patent application was that he deliberately decided to withhold the information from the USPTO. *Id.*

121.    Relevant exemplary cases further include *Aventis Pharma S.A. v Hospira Inc.*, 675 F.3d 1324 (Fed. Cir. 2012). In *Aventis*, the CAFC affirmed a finding of inequitable conduct because two material references that would have invalidated the patent were intentionally withheld during prosecution. *Id.* at 1337. The inventor testified that he did not cite the prior art references to the USPTO because he believed that these experiments were failures and that they did not need to be disclosed. *Id.* at 1335. Further, the inventor's testimony confirmed that he disclosed the *Rowinsky* reference, which identified the "problem" the inventors were trying to solve, but did not disclose the *Vidal* reference, which revealed the "solution". *Id.* The district court found that the inventor's testimony was not credible and indicated that the inventor had intentionally ignored experiments that did not support his conclusion regarding the relevance of the omitted prior art

references. *Id.* The CAFC found this evidence and the district court's credibility determination sufficient to support the district court's inequitable conduct finding. *Id.* at 1336.

122.    Relevant exemplary cases further include *Everlight Electronics Co. v. Nichia Corp.*, 719 F. App'x. 1008 (Fed. Cir. 2018). In *Everlight*, the CAFC affirmed a finding of no specific intent, because, while the inventors should have been more careful in keeping records and documenting their findings, there was insufficient evidence of intent to deceive. *Id.* 1015-16. "A mere showing that documents should have been submitted to the USPTO but have been lost, without a showing of additional facts probative of intent to deceive, does not rise to the level of specific intent under this court's precedent." *Id.* at 1015.

123.    Relevant exemplary cases further include *Energy Heating LLC v Heat On-The-Fly LLC*, 889 F.3d 1291 (Fed. Cir. 2018). In *Energy Heating*, the CAFC affirmed a finding of inequitable conduct because the inventor knew that prior commercial sales were material and specifically intended to deceive USPTO by not disclosing those sales. *Id.* at 1299-1303. The sales were not to experiment, i.e. not to test the invention, but instead were intended to generate income. Specifically, 61 total pre-critical date sales generated $1.8 million. *Id.*

124.    Relevant exemplary cases further include *Intellect Wireless Inc. v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013). In *Intellect Wireless*, the CAFC affirmed a finding of inequitable conduct because the applicant filed a false affidavit regarding reduction to practice and failed to cure the misconduct. *Id.* at 1342. "This alone establishes materiality." *Id.* A cure requires an explicit correction of the error, and an explanation of what the exact facts actually are. *Id.* at 1343. Further, the district court found a "pattern of false and misleading statements during prosecution of related patents." *Id.* at 1344.

125.    Relevant exemplary cases further include *Apotex Inc. v UCB Inc.*, 763 F.3d 1354 (Fed. Cir. 2014). In *Apotex*, the CAFC affirmed a finding of inequitable conduct based on the fact that the inventor was aware that the prior art was made according to his claimed process, concealed this knowledge from the USPTO, and misrepresented the nature of the prior art through his counsel's arguments and an expert declaration. *Id.* at 1359-63. Specifically, the district court found that the inventor "knew, or at least had a strong suspicion, that he was seeking to patent the very same process used to obtain an already existing and widely available drug." *Id.* at 1362. Further, the inventor knew that certain "assertions he made in the specification regarding the prior art were at least misleadingly incomplete, if not plainly inaccurate." *Id.* Finally, the inventor withheld relevant prior art and submitted results of experiments that he never conducted. *Id.*

### D.  Mr. McIntosh Did Not Satisfy His Duty To Disclose Information Material To Patentability

#### i.    Mr. McIntosh's Filing of a False Declaration Before the USPTO was Material Misconduct

126.    As explained above, during prosecution of the '681 Patent, Mr. McIntosh submitted a Declaration to the PTO in response to a non-final rejection.  In his Declaration, Mr. McIntosh addressed prior art cited by the USPTO.  One such reference he addressed was the prior art reference to Dean.  While addressing Dean, Mr. McIntosh stated he was an "expert" and told the PTO that Dean could not be operated with one hand by a typical user.  He argued this to distinguish the prior art from his claimed invention, which he argued could be operated with one hand. Attachment D at PSAW00000228-229, ¶ 7.

127.    Mr. McIntosh also told the PTO that he could estimate the center of gravity in Dean. He described where he believed the center of gravity would be located on the saw by stating "a

center of gravity of the saw 110 is spaced from the handle 114." *Id.*  Of note, Dean does not

discuss the location of the center of gravity of the saw in the written description. *See* Attachment

I.  Therefore, Mr. McIntosh's representations to the PTO were not based on any written disclosure

in the reference.

128.    Despite asserting under oath that he could determine the center of gravity of the

saw in Dean, during his deposition Mr. McIntosh repeatedly contradicted himself.  He stated that

he did not think that one could determine the center of gravity for a saw by looking at a picture,

including patent figures, because there are weights, mass, and other things involved.  For example,

Mr. McIntosh stated:

> Q. Can you determine the center of gravity for any bandsaw by looking at a picture
> of the bandsaw.
> A. I don't think so.
> Q. And why not?
> A. Because there's weights, mass, and other things involved in it.
>
> ***
>
> Q. If you had mechanical drawings for a bandsaw, could you tell the center of
> gravity for a bandsaw based on looking at mechanical drawings?
> A. I don't believe so.
> Q. Why not?
> A. Same answer I just said before, the weight, mass.
> Q. So could you tell the center of gravity for a saw design by looking at patent
> drawings of the saw?
> A. Same answer. You're asking the same question over and over.
> Q. It's a little bit different. So you would agree that you cannot determine the center
> of gravity for a saw by simply looking at patent drawings for that design, correct?
> A. I'm not an expert on center of gravity and patent drawings. I'm wouldn't say
> I'm not an expert on it, but I don't understand your question of what you're trying
> to get here.

Q. Well, let's look at the 681 patent. If you had only the drawings of the 681 patent to looking at, could you determine the precise center of gravity for that saw design based upon just looking at the patent drawings?

A. Is there any particular picture you're talking about?

Q. No. If you just had those drawings to look at, can you determine the center of gravity for the saw depicted no [*sic*] those drawings?

A. I'm not sure what you mean by center of gravity.

Q. You don't know what the center of gravity?

A. I don't know what you mean by any saw the center of gravity, what you're looking for.

Q. Do you understand that –

A. Are you looking for pinpoint? Are you looking for front to back, side to side? I'm not sure what you're looking for.

Q. I'm looking for a pinpoint.  You understand that a saw has a pinpoint for a specific center of gravity, correct?

A. I can't find that by looking at a picture.

Q. Why is it you can't find the precise center of gravity by looking at the drawings of the took in the 681 patent?

Like I said before, there's weight and mass involved in that.

Attachment E at 61:1-12, 61:23-64:11 (objections omitted).

129.     Additionally, at his deposition, Mr. McIntosh was asked about Dean.  In his deposition, Mr. McIntosh contradicted his statements in his Declaration stating that he could not pinpoint or even estimate where the center of gravity on the bandsaw of Dean would be located:

Q. Sure. By looking at the drawings in the 848 patent [Dean], can you identify the precise center of gravity for the saw shown in Figure 3?

A. No.

Q. Why not?

A. Same answer as before.  There's mass.  There's weight involved in it.

Q. For the saw on the Figure 3 of the 848 patent, can you estimate where the center of gravity is?

A. No.

Q. And again, is that because the mass and weights and things are not reflected in the patent drawings?

A. I would be guessing.  Wouldn't have enough information.

Attachment E at 67:16-68:14 (objections omitted)

130.    While before the PTO Mr. McIntosh asserted that the center of gravity of the saw in Dean was "spaced from the handle," Attachment D at PSAW00000228-229, ¶ 7, during his deposition he admitted that he could not actually determine or even estimate the center of gravity of the saw in Dean.

131.    Accordingly, Mr. McIntosh submitted false statements to the PTO in his Declaration to try to overcome the references cited against his then-pending claims.  It is important to understand that the PTO did not disagree with Mr. McIntosh's statements regarding the location of the center of gravity in each of the prior art references' saws.  Nor did it disagree with Mr. McIntosh's arguments that none of the prior art references' saws could be operated with one hand.  Instead, the PTO stated that the claims at the time did not require one-handed operation.

132.    It is also important to note that when Mr. McIntosh cancelled all pending claims and submitted new claims during prosecution, his new claims included both the one-handed operation claim language and language stating that the saw should be "substantially weight balanced."  I understand that the Court construed the term "substantially weight balanced" to mean "the center of gravity is in the middle of the frame across from the throat." Attachment H, D.I. 84 at 25.  It is also important to note that at no point during prosecution did Mr. McIntosh correct statements made in his Declaration regarding the inability to determine the center of gravity of a saw from pictures alone.

43

133.    Mr. McIntosh's filing of a false Declaration before the PTO is thus material misconduct.

### ii.    Mr. McIntosh Failed To Show Any Reasonable Inference From Filing A False Declaration Other Than An Intent To Deceive.

134.    Mr. McIntosh is the sole inventor of the '681 Patent.  As discussed above, when trying to get his invention patented, he submitted a Declaration to the PTO that attested, among other things, that the "statements made herein [were] of [his] own knowledge [and were] true." Attachment D at PSAW00000232.  But, as evidenced by his deposition testimony during litigation, the statements that Mr. McIntosh submitted in his Declaration were false.  He told the PTO that he could estimate the center of gravity of saws presented in prior art references.  But in his deposition, he stated that  he cannot estimate the center of gravity because there are other factors that must be taken into account (e.g., weight, mass).

135.    Mr. McIntosh failed to provide any explanation for filing a Declaration that he knew was false other than that he intended to deceive the PTO.  Indeed, when faced with the same exact reference (Dean) as presented by the PTO during prosecution, in his deposition Mr. McIntosh contradicted his Declaration statements, stating in deposition that he cannot even estimate the center of gravity of the Dean saw.  Mr. McIntosh set forth no other reasonable inference that can be drawn except that he intended to deceive the PTO to overcome the cited prior art and obtain allowance of his patent.

### iii.    The Milwaukee Prior Art Band Saws Were "But For" Material And Mr. McIntosh Failed To Disclose Them Even Though He Knew That They Were Material Prior Art.

136.    Not only did Mr. McIntosh submit a false Declaration to the PTO during prosecution, but he also failed to disclose material prior art to the PTO.  I understand that

Milwaukee Tool had a number of prior art bandsaws in the market long before Mr. McIntosh filed his application.  I also understand that one such prior art bandsaw that Milwaukee Tool manufactured and offered for sale before Mr. McIntosh filed his application leading to the '681 Patent was bandsaw model number 6225 ("Milwaukee 6225 bandsaw").  I have reviewed the prosecution history of the '681 Patent and note that Mr. McIntosh did not cite any Milwaukee Tool prior art bandsaws in his Information Disclosure Statements submitted to the PTO, including not citing the Milwaukee 6225 bandsaw.

137.   As described above, during prosecution, Mr. McIntosh canceled all of his pending claims and submitted a new set.  As also noted above, on December 13, 2012, the PTO issued a non-final rejection that rejected the pending claims under 35 U.S.C. § 103 as being unpatentable over the design patent Schepige in view of Buck.  Attachment D at PSAW00000041.

138.   After receiving the rejection, Applicant amended the claims to recite, in relevant part, "said handle assembly permitting the operator to lift and operate the saw **with one hand**, and said handle assembly being located such that the saw is **substantially weight balanced, so that the saw can be utilized in a single-handed operation** for cutting the workpiece while holding the workpiece with another hand of the operator."  Attachment D at PSAW00000025.  Applicant also argued that the prior art design patent reference to Schepige describes a bandsaw for two-handed operation that is thus in "direct contradistinction over the presently claimed invention, where it is currently reciting a single handed capability and usage." Attachment D at PSAW00000028-29.  Because Schepige is a design patent, Applicant's arguments relied only on the drawings in Schepige to assess that Schepige was designed for two-handed operation, not the claimed one-handed capability.  *Id*.

45

139.    After this, the PTO allowed the claims and issued the '681 Patent.  Of note, the PTO stated in the Reasons for Allowance that the claims are "allowable because the prior art fails to teach a handle assembly permitting the operator to lit [*sic*] and operate the saw with one hand, where a trigger within a hand grip portion is located between a first drive wheel and a second drive wheel."  Attachment D at PSAW00000013.

140.    At no point during prosecution did Mr. McIntosh inform the PTO about the existence of the Milwaukee prior art bandsaws, including the Milwaukee 6225 bandsaw. Mr. McIntosh, however, was aware that Milwaukee Tool had prior art bandsaws.  In his deposition he admitted this and stated that he not only was aware of them but that he had personally used them:

Q. Did you personally, ever try to use a handheld bandsaw one handed before 1999?

A. Yes.

Q. Which saws do you specifically remember trying to do that?

A. Milwaukee.

Attachment E at 145:1-6.

141.    I understand from my review of Dr. Samir Nayfeh's expert report that one such prior art bandsaw was the Milwaukee 6225 bandsaw that Milwaukee Tool had been offering for sale and manufacturing since well before the priority date of the '681 Patent. I also understand that Milwaukee Tool not only offered for sale its prior art bandsaws to consumers, but it also advertised its bandsaws in materials, such as catalogues.  *See, e.g.*, Attachment F, METCO_00094107.  I also understand that included in those public advertisements were descriptions of the bandsaws center of gravity, noting, for example, that it was "located directly over [the] blade." Attachment G, METCO_00094145.

46

142.    In my opinion, the Milwaukee prior art bandsaws, specifically model 6225, was but-for material prior art that should have been disclosed by Mr. McIntosh during prosecution.  In its Reasons for Allowance, the PTO stated that the cited prior art failed to disclose a bandsaw that could be lifted and operated with one hand with a trigger within a hand grip portion located between a first drive wheel and a second drive wheel.  Attachment D at PSAW00000013.  But, as Mr. McIntosh admitted, the Milwaukee bandsaws that existed before 1999 could be used and lifted with one hand:

Q. Did you, personally, ever try to use a handheld bandsaw one handed before 1999?

A. Yes.

Q. Which saws do you specifically remember trying to do that?

A. Milwaukee.

Q. And do you remember what caused you to use the Milwaukee bandsaw one handed?

A. I could do it when I was sitting on the ground.  I could pull the materials into the blade and saw sitting on the ground.

***

Q. Did you see big guys doing that [lifting] with a Milwaukee bandsaw?

A. Yeah.

Q. Where did you see them doing that?

A. On job sites.

Q. And that was all prior to 1999?

A. Yes.

47

Attachment E at 145:1-146:13.

143.    I have reviewed the expert report of Dr. Nayfeh and understand in his opinion, the Milwaukee 6225 bandsaw anticipates claims 1-3, 5-9, and 11-13 because this bandsaw includes every limitation recited in those claims.  Nayfeh Expert Report at Section XII.A.  I also understand from reviewing Dr. Nayfeh's report that rechargeable NiCd batteries, as required by dependent claims 4 and 10, were well-known in the art before the priority date of the invention.

144.    It is important to note that in the Notice of Allowance, the PTO stated the reasons for allowance was because the prior art failed to disclose a bandsaw that could be lifted and operated with one hand and that had the trigger located between the axes of the wheels.  But as I noted above, as described in Dr. Nayfeh's opening report, the Milwaukee 6225 bandsaw discloses these limitations.  This further confirms that the Milwaukee 6225 bandsaw was material prior art and was not cumulative over the prior art that was submitted to the PTO during the prosecution of the patent application that led to the '681 Patent.

145.    Accordingly, in my opinion and based upon my review of Dr. Nayfeh's analysis of the Milwaukee 6225 bandsaw and what was known in the prior art, had the PTO been made aware of the existence of the Milwaukee 6225 bandsaw, it would not have granted the Asserted Claims of the '681 Patent. Thus, the Milwaukee 6225 bandsaw was "but for" material to the patentability of claims 1-13 of the '681 patent.

       iv.       **Mr. McIntosh Failed To Show Any Reasonable Inference From His Failure To Disclose Material Prior Art Other Than An Intent To Deceive.**

146.    Mr. McIntosh failed to provide any explanation for his failure to disclose the Milwaukee Tool prior art saws, including model 6225, other than that he intended to deceive the

PTO.  As Mr. McIntosh testified, he was not only aware of Milwaukee Tool's prior art bandsaws before 1999, but he himself had used them one-handed and witnessed others lifting them one-handed. Attachment E  at 145:1-146:13.  Despite this, Mr. McIntosh failed to notify the PTO about the existence of these prior art bandsaws.

147.    Mr. McIntosh failed to provide any explanation for withholding this material prior art other than having an intent to deceive the PTO in order to obtain his patent.  The '681 Patent describes the invention as providing a band saw "designed for one-handed operation."  Attachment A at 1:14-16.  In his Declaration, Mr. McIntosh advertised his invention as providing one-handed capability. Attachment D, PSAW00000227-230, ¶¶ 6-8.  Mr. McIntosh also explained that he founded Stout Tool Corporation in 2003 to manufacture and market the "band saw as described and claimed in the above identified application."  *Id.* ¶ 9.  Mr. McIntosh also informed the PTO that he focused his advertisement "on the ability to easily operate [Stout's] portable band saw while fully supporting the saw with only one hand."  *Id.* ¶ 12.

148.    Mr. McIntosh thus understood that a focus of his claimed invention was on the ability to use the bandsaw with one hand.  Despite this, Mr. McIntosh withheld material prior art by not disclosing Milwaukee Tool's prior art bandsaws, such as the 6225 model, that, as Mr. McIntosh admitted, could also be used with one hand.  Mr. McIntosh provided no other reasonable inference from his failure to disclose these prior art bandsaws, such as the 6225, other than that he intended to deceive the PTO and withhold material prior art to obtain his patent.

## VI.    CONCLUSION

149.    For these reasons, it is my opinion that Mr. McIntosh did not satisfy his duty to disclose information material to patentability.  Mr. McIntosh's filing of a false declaration before the PTO was material misconduct.  Mr. McIntosh failed to show any reasonable inference from filing a false declaration other than an intent to deceive. Mr. McIntosh failed to disclose Milwaukee

Tool's prior art band saws, such as the Milwaukee 6225 bandsaw, even though he knew that they were material prior art. Mr. McIntosh failed to show any reasonable inference from his failure to disclose material prior art other than an intent to deceive.

## VII.   TRIAL EXHIBITS

150.    I have not yet prepared any demonstrative exhibits for trial but I may do so pursuant to the schedule set by this Court.

## VIII.   SUPPLEMENTATION

151.    I reserve the right to supplement or amend this expert report if additional facts and information that affect my opinions become available through discovery or otherwise.

Executed on  in Falls Church, VA.


By:

_____
    Dr. Gregory J. Gonsalves               May 8, 2023